626 A.2d 123

Melissa REICHLEY, a minor and student, by her parent and natural guardian, Helen WALL, and Helen Wall, in her own right, and Steven Gibson, a minor and student, by his parent and natural guardian, Brian L. Gibson, and Brian L. Gibson, in his own right, and John Bruni and Laura Bruni, minors and students, by their parent and natural guardian, Barbara Bruni, and Barbara Bruni, in her own right, and Melissa Jauss and Adam Jauss, minors and students, by their parent and natural guardian, Irene Jauss, and Irene Jauss, in her own right, Appellees,

v.

NORTH PENN SCHOOL DISTRICT, Appellee,

and

North Penn Education Association, an unincorporated association, and All unnamed teachers and professional employees employed by North Penn School District who are members of the North Penn Education Association, Appellants,

and

The Commonwealth of Pennsylvania, Appellee.

Supreme Court of Pennsylvania.

Argued April 6, 1992.

Decided May 27, 1993.

520

A. Martin Herring, Philadelphia, for appellant.

Alaine S. Williams, Catherine L. Merino, Philadelphia, for amicus, Pa. Fed. of Teachers.

Mary Catherine Frye, Harrisburg, for amicus, Pa. State Educ. Assoc.

Frank L. Caiola, Morristown, for Students, Parents, etc.

Charles Potash, Kenneth A. Roos, Blue Bell, for North Penn Sch. Dist.

Stephen S. Russell, New Cumberland, for amicus, Pa. Sch. Bds. Assoc.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

ZAPPALA, Justice.

This is an appeal from an order of the Court of Common Pleas of Montgomery County holding that the Public Employee Relations Act (PERA), Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. § 1101.101 et seq., is unconstitutional insofar as it

allows strikes by public educators. Our jurisdiction derives from 42 Pa.C.S. § 722(7).

This matter arose in 1986, when negotiation and mediation failed to produce a new collective bargaining agreement between the North Penn School District and the North Penn Education Association. As permitted by Section 1003 of PERA, 43 P.S. § 1101.1003, the teachers and professional employees represented by the Association commenced a strike against the District on September 2, 1986. On October 7, 1986, a group of students and parents, the Appellees herein, filed this action against the District, the Association, and the Commonwealth, seeking declaratory and injunctive relief on the basis that PERA is unconstitutional to the extent that it allows teachers to strike.[1]

The Association and the District filed preliminary objections asserting that the court lacked jurisdiction in light of 42 Pa.C.S. § 761, vesting Commonwealth Court with jurisdiction of actions against the Commonwealth, and that the plaintiffs lacked standing. On plaintiffs' motion pursuant to Pa.R.C.P. 2232(b), the Commonwealth was removed as a defendant on October 20, 1986.

In ruling on the preliminary objections, however, the court found that the Commonwealth had been removed only as to the action for injunctive relief. Based on this determination that the Commonwealth remained a party (indeed, the court found the Commonwealth to be an indispensable party) to the action for declaratory relief, the court held that jurisdiction was properly in Commonwealth Court and dismissed the action.[2] The court also decided that the plaintiffs lacked standing.

1. The District filed a separate action against the Association to enjoin the strike pursuant to Section 1003. After hearings, the court granted the District's request for injunction and the teachers returned to work in compliance with the order. The District and the Association ultimately entered into a collective bargaining agreement in January of 1987.

2. Pursuant to 42 Pa.C.S. § 5103(a), it would have been proper for the court to transfer the matter to the Commonwealth Court rather than dismiss it.

On appeal of the dismissal, Commonwealth Court held that the Commonwealth was not an indispensable party to the action for declaratory relief, and thus the common pleas court could exercise jurisdiction after the Commonwealth had been removed as a party. In the interest of judicial economy, Commonwealth Court also addressed the other basis for the dismissal and held that the parents had standing to bring the action. 113 Pa.Commw. 528, 537 A.2d 391 (1988). Accordingly, the case was remanded for further proceedings. Following a two day non-jury trial in May of 1990, briefing, and argument in July of 1990, the court issued an Opinion and Order on October 16, 1990, holding that "Act 195, insomuch as it grants public school teachers the right to strike, is unconstitutional." Opinion at 4.

■ At the outset, we must address the contention of the Appellants that the court below erred in reaching the merits of the constitutional argument because the matter was moot. The Appellants cite *Gulnac v. South Butler County Education Association*, 526 Pa. 483, 587 A.2d 699 (1991) as controlling. In *Gulnac*, parents brought an action to enjoin a work stoppage by teachers and to have the teachers' right to strike pursuant to Act 195 declared unconstitutional. The common pleas court held that the parents lacked standing to seek injunctive relief. Thereafter, the court entered a final order declaring the limited right to strike under Act 195 unconstitutional.

We vacated the court's order, stating that "[o]nce the trial court held that Appellees had no standing to seek injunctive relief against the striking teachers, an issue not presently before us, it becomes moot whether, in the abstract, the teachers had a theoretical right to strike under our Constitution." 526 Pa. at 487, 587 A.2d at 700–701. We also noted, "[f]urther litigation was impossible here *because the court held that Appellees lacked standing to pursue it and that determination ended the controversy,* rendering the declaratory judgment superfluous and academic only." *Id.* at 488, 587 A.2d at 701. (Emphasis added).

The Appellants argue that in this case, once the school district had obtained an injunction and back-to-work order and then negotiated a contract with the teachers, there was likewise no longer any controversy and the declaratory judgment action should have been dismissed as moot.

We find *Gulnac* to be distinguishable. As the emphasized language above indicates, a decision on the merits was improper because it had been advanced by those who, in that court's judgment, had no standing. The ruling on standing was never appealed and became the law of the case. In this case, the Commonwealth Court considered the standing question and determined that the parents' interest was sufficiently adverse to the teachers' to create a controversy so as to entitle them to standing under the Declaratory Judgments Act. Thus the constitutional question was advanced by a party who, under the law of the case, had standing to raise it.

■ It is a separate question whether mootness precluded further review once the court had granted the school district's request for an injunction. Commonwealth Court, in deciding to address the standing question, determined that the mootness doctrine should not bar the action because it involves "a *question of significant dimension that is capable of repetition yet evading review.*" 113 Pa.Commw. at 532, 537 A.2d at 393 (1988). We agree with this characterization. Given the time involved in the hearing and deciding of cases, it is virtually certain that any teachers' strike would either be resolved through negotiation or be enjoined on a finding of clear and present danger before full appellate review of the constitutional question could be had. We have previously decided that mootness does not prevent the court from resolving such questions. *Colonial Gardens Nursing Home v. Bachman*, 473 Pa. 56, 373 A.2d 748 (1977).[3]

3. For the same reason, we are persuaded that the passage of Act 88 of 1992 during the pendency of this appeal has not rendered the appeal moot. Act 88 effectively removed public educators from the scope of PERA by amending the School Code, adding provisions regarding collective bargaining, 24 P.S. § 11–1101–A et seq. (Purdon's Legislative Service 1992). Act 88 provides for mandatory arbitration where a work stoppage would prevent the school district from scheduling 180

■ The first task in addressing the question of the constitutionality of the statute is identifying the standard of review. The appellees suggest that because Article III, Section 14 states that "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth," public education is a "fundamental right" under the state constitution, requiring that the statute be subject to "strict scrutiny." Under this analysis, the statute must be narrowly drawn to serve a compelling state interest. The appellants maintain that public education is not a "fundamental right" under either the federal or state constitution and thus the statute should be reviewed under the "rational basis" test. According to this standard, legislation is constitutional so long as it is reasonably related to a legitimate state interest. This is the standard the common pleas court found applicable and purported to apply.

It must be noted in the interest of clarity, however, that the "strict scrutiny"/"rational basis" framework is not applicable to the question presented. This is not an equal protection case. The "strict scrutiny" analysis suggested by the appellees must, therefore, be rejected outright.

In the *Teachers' Tenure Act Cases*, 329 Pa. 213, 197 A. 344 (1938), we considered arguments that recently enacted amendments to the School Code violated Article I, Section 17 of the Pennsylvania Constitution (impairment of obligations of contracts), and that it was contrary to Article X, Section 1, the predecessor to current Article III, Section 14. These arguments had been advanced by school districts, whose power to terminate teacher contracts without cause had been eliminated

days of instruction. Section 1125–A(b). The arbitration, however, is not binding, since either the school district or the union may reject it within ten days. See Section 1125–A(k). Thus the strike is not so much ended as suspended during the period of arbitration.

The same difficulties that were the basis for the lower court's determination that PERA was unconstitutional insofar as it permitted public educators to strike remain under Act 88. Accordingly, we have considered it necessary to resolve the fundamental question whether the legislature may, consistent with Article III, Section 14 of the state constitution, permit teachers to strike at all.

by the new Act, which also required that teachers be offered new contracts consistent with the Act. In the course of resolving both constitutional challenges in favor of the Act, we made the following observations:

When the people directed through the Constitution that the General Assembly should 'provide for the maintenance and support of a thorough and efficient system of public schools,' it was a positive mandate that no legislature could ignore. The power over education is an attribute of government that cannot be *legislatively* extinguished....

In considering laws relating to the public school system, courts will not inquire into the reason, wisdom or expediency of the legislative policy with regard to education, but whether the legislation has a reasonable relation to the purpose expressed in Article X, Section 1, and whether the fruits or effects of such legislation impinge the Article by circumscribing it or abridging its exercise by future legislatures within the field of "a thorough and efficient system of public schools." So implanted is this section of the Constitution in the life of the people as to make it impossible for a legislature to set up an educational policy which future legislatures cannot change. *The very essence of this section is to enable successive legislatures to adopt a changing program* to keep abreast of educational advances. The people have directed that the cause of public education cannot be fettered, but must evolute [sic] or retrograde with succeeding generations as the times prescribe. Therefore all matters, whether they be contracts bearing upon public education, or legislative determinations of school policy or the scope of educational activity, *everything directly related to the maintenance of a "thorough and efficient system of public schools," must at all times be subject to future legislative control....*

Therefore, while the legislature has set up in the new Act a tenure system for teachers and has provided for their qualifications, compensation and contracts, all of these provisions, and the contracts themselves, have written into them by implication from the Constitution a distinct under-

standing that subsequent legislation may change or abolish the existing features of the school system of the teachers' contracts. . . . For these reasons, [the] objection that the Teachers' Tenure Act abridges the power of future legislatures falls, because a subsequent legislature may abolish this Act, in toto, if it deems it necessary to do so under Article X, Section 1. And such future action can, for the same reason, be taken without producing an impairment of the obligations of the contracts for which the new Act provides because the Constitution only permits such contracts to be made subject to the right of change or regulation by future legislatures. This rule also applies to contracts entered into under the prior School Code.

329 Pa. at 224–26, 197 A. at 352–53. (Emphasis added.)

We have set the foregoing discussion out at some length to demonstrate the context of our statement, cited by the court below, that courts considering laws relating to the public school system may inquire "whether the legislation has a reasonable relation to the purpose expressed in Article X, Section 1." Although similarly phrased, this is not the "rational relationship test" of equal protection analysis. We cannot overlook the preceding acknowledgment that "courts will not inquire into the reason, wisdom or expediency of the legislative policy with regard to education," or the subsequent pronouncement that the inquiry should consider "whether the fruits or effects of such legislation impinge the Article by circumscribing it or abridging its exercise by future legislatures. . . ." The inquiry, then, must focus on (a) whether the legislation relates to the purpose of the constitutional provision—providing a system of public education is a basic duty of government that the legislature cannot ignore—without regard to the way the legislature has chosen to fulfill achieve this purpose, and (b) whether the legislation purports to limit the further exercise of legislative power with respect to the subject of public education.

In conducting such an inquiry, the courts are bound by the usual rules of statutory construction. It is presumed "[t]hat the General Assembly does not intend to violate the Constitu-

tion ... of this Commonwealth." 1 Pa.C.S. § 1922(3). Further, it has long been the rule that one challenging a legislative enactment on constitutional grounds bears a heavy burden of showing that the statute "clearly, palpably, and plainly violates the Constitution, and any doubts are to be resolved in favor of a finding of constitutionality." *Pennsylvania Liquor Control Board v. Spa Athletic Club*, 506 Pa. 364, 370, 485 A.2d 732, 735 (1984). Although the court below duly recited these standards and purported to apply them, we cannot agree with its conclusion that the appellees met their heavy burden.

■ The declaration of policy in Act 195 states

it is the public policy of this Commonwealth and the purpose of this Act to promote orderly and constructive relationships between all public employers and their employees subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employees are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution....

43 P.S. § 1101.101. The Act goes on to provide a system of collective bargaining and mediation of disputes. In the event mediation fails, employees are permitted to engage in a strike, which may be enjoined on a showing that the strike "creates a clear and present danger or threat to the health, safety or welfare of the public." 43 P.S. § 1101.1003.

The court below took testimony on the disruptive effect the strike, and rescheduling to make up lost instructional days caused by the strike, had on athletic programs, special education programs, the college application process for high school seniors, and summer employment opportunities. There was also testimony to the effect that students and parents lost respect for the teachers, as well as testimony by witnesses submitted as experts that extended periods of lost instructional time have a negative impact on scholastic achievement. The court credited virtually all of the evidence offered by the

plaintiffs in this regard. In addition, the court cited several studies regarding the number of teachers' strikes and the number of lost instructional days in the years since the passage of Act 195.

Based on this evidence, the court concluded that "Act 195 has led to an increase in disruption of the school districts throughout the Commonwealth as opposed to the hoped for result of reduced employer-employee tension. Its provisions do not lend themselves to effective dispute settlement between school districts and teachers, but create an inefficient confrontation process that works to no one's advantage." Opinion at 18. The court went on to observe that, "While both sides have legitimate concerns that at times naturally fall in opposition, the rigidity of the system caused by Act 195 has resulted in a breakdown of cooperation. The Pennsylvania Labor Relations Board and the instrumentalities thereof, responsible for aiding in dispute settlement, are weak and therefore the mediation required by PERA is in many instances meaningless." Opinion at 22. It also accepted the plaintiffs' contention that despite the right to strike granted by Act 195 and the attendant disruptions, Pennsylvania teachers had not fared significantly better in the collective bargaining process.

██ Whether any of these assessments is accurate or not, these plainly are policy considerations for the legislature and not the courts to determine and act on. The court below acknowledged at the outset of its analysis that, "[t]he scale is weighted on both sides with legitimate interests." Opinion at 16. This recognition should have ended the inquiry. The General Assembly has weighed those considerations and deemed it appropriate to allow most public employees, including teachers, a right to strike. The adversarial judicial system is not an appropriate forum for analyzing whether this legislation works well or poorly, as intended or in ways unforeseen. If a statute does not work as expected, the legislature is the appropriate body to make the judgment and enact corrective legislation. That body has the competence to weigh the policy considerations and legislate initially and that body has the competence to reassess those considerations, the efficacy of

the initial legislation, and the wisdom of continuing thereunder or changing course.

The Order of the Court of Common Pleas holding Act 195 unconstitutional insofar as it allows strikes by public educators is reversed.

LARSEN did not participate in the consideration or decision of this case.

McDERMOTT, J., did not participate in the decision of this case.